# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

## STATE OF TENNESSEE v. LETALVIS COBBINS, LEMARICUS DAVIDSON, and GEORGE THOMAS

**Appeal as of Right from the Criminal Court for Knox County**
**Nos. 86216A, 86216B & 86216C     Jon Kerry Blackwood, Senior Judge**

---

**No. E2012-02025-CCA-10B-DD - Filed October 25, 2012**

---

On September 26, 2012, the State of Tennessee, pursuant to Tennessee Supreme Court Rule 10B, section 2.02, appealed the trial court's order denying its motion to have the trial judge recused or otherwise disqualified from presiding over the three cases at issue in this appeal. After initial review, this Court, pursuant to Rule 10B, section 2.04, stayed all further proceedings in these cases pending resolution of this appeal. Then, in accordance with the mandate of Rule 10B, section 2.06, that this Court act on an expedited basis, this Court, pursuant to Tennessee Supreme Court Rule 10B, section 2.05, requested and received responses from the defendants on October 8, 2012. The issue presented is as follows: Whether a person of ordinary prudence in the trial court's position, knowing all the facts known to the trial court, would find a reasonable basis for questioning the trial court's impartiality in these three cases? After a thorough de novo review of the record and relevant authorities, we conclude that the trial court erred in denying the State's motion for recusal. The judgment of the trial court is reversed, the trial judge is recused, and the stay previously entered in these cases shall remain in effect until the Chief Justice of the Tennessee Supreme Court appoints a replacement trial judge, or pending further orders of this Court or the Tennessee Supreme Court.

**Tenn. Sup. Ct. R. 10B Appeal as of Right; Judgment of the Criminal Court Reversed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General, and Leland

L. Price, Assistant District Attorney General, for the appellant, State of Tennessee.

Kimberly Ann Parton, Knoxville, Tennessee, for the appellee, Letalvis Cobbins.

David M. Eldridge, Douglas A. Trant, and Loretta G. Cravens, Knoxville, Tennessee, for the appellee, LeMaricus Davidson.

W. Thomas Dillard and Stephen Ross Johnson, Knoxville, Tennessee, for the appellee, George Thomas.

## OPINION

## I. Procedural History and Facts

The State of Tennessee, through the Office of the Attorney General, has filed a petition for recusal appeal from Senior Judge Jon Kerry Blackwood's (hereinafter referred to as the "trial court" or "Judge Blackwood") denial of the State's motion for recusal. *See* Tenn. Sup. Ct. R. 10B, section 2.02. This appeal arises from actions taken by the trial court in its determination of whether, as a successor judge under Rule 25(b) of the Tennessee Rules of Criminal Procedure,[1] the trial court could act as thirteenth juror to approve the verdicts in these cases, as required by Rule 33(d) of the Tennessee Rules of Criminal Procedure.[2] In order to understand the procedural posture and grounds for this appeal, we detail the relevant history and facts below.

---

[1] Rule 25(b) provides the following:

> (1) After a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence, death, sickness, or other disability.
> (2) The successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason.

Tenn. R. Crim. P. 25(b).

[2] Rule 33(d) provides the following:

> The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence. Upon request of either party, the new trial shall be conducted by a different judge.

Tenn. R. Crim. P. 33(d).

In a recent order addressing the trial court's role as a thirteenth juror in this case, the Tennessee Supreme Court recounted the events leading up to the involvement of Judge Blackwood in the proceedings as follows:

> Former Judge Richard Baumgartner presided over the separate trials and sentencing hearings of these three defendants. Each defendant was convicted of multiple non-capital offenses. In addition, Mr. Davidson and Mr. Thomas were convicted of the first degree murders of Channon Christian and Christopher Newsom, and Mr. Cobbins was convicted of the first-degree murder of Ms. Christian. After capital sentencing hearings before a jury in each case, Mr. Davidson received the death penalty, and Messrs. Cobbins and Thomas received sentences of life without the possibility of parole. On March 10, 2011, before hearing the respective motions for a new trial, former Judge Baumgartner resigned from the bench after pleading guilty to one count of official misconduct. The Chief Justice designated Senior Judge Jon Kerry Blackwood to serve as the successor judge to hear the motions for new trial and perform all other duties required of a trial judge on these cases.

The original trial judge, Judge Richard Baumgartner, did not expressly approve the jury verdicts as thirteenth juror in these three cases. *See State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995) (holding that Rule 33 of the Tennessee Rules of Criminal Procedure imposes a mandatory duty upon a trial judge to serve as the thirteenth juror in every criminal case). Therefore, as required by Rule 25(b)(2) of the Tennessee Rules of Criminal Procedure, Judge Blackwood, as the successor judge, must consider whether he could perform the thirteenth-juror review. *See State v. Brown*, 53 S.W.3d 264, 275 (Tenn. Crim. App. 2000). A successor judge, assessing whether he or she is able to act as thirteenth juror, must "determine the extent to which witness credibility was a factor in the case and the extent to which he had sufficient knowledge or records before him in order to decide whether the credible evidence, as viewed by the judge, adequately supported the verdict." *Brown*, 53 S.W.3d at 275. "When witness credibility is the *primary* issue raised in the motion for new trial, the successor judge may not approve the judgment and must grant a new trial." *State v. Biggs*, 218 S.W.3d 643, 654 (Tenn. Crim. App. 2006) (emphasis added) (citing *Brown*, 53 S.W.3d at 275).

On June 9, 2011, at a hearing on Defendant Cobbins' motion for new trial, the trial court concluded that, pursuant to Rule 25 of the Tennessee Rules of Criminal Procedure, it could act as thirteenth juror. The trial court stated that, after reviewing the transcript of Cobbins' trial, audio of Defendant Cobbins' testimony, and all exhibits admitted into evidence, "this Court hereby accepts and approves the verdict of the jury as 13th juror." In

support of its determination, the trial court made the following detailed findings:

In this case, Mr. Cobbins' position has been, from review of his testimony, that he was unaware of the events that were going to occur and the conduct of his codefendant[,] Mr. Davidson . . . . That's his claim. And the question becomes: Is there other physical evidence in the record that would support his conviction absen[t] a determination of the credibility of the witnesses?

First, Mr. Cobbins pled guilty to a felony. His own admission is that he was guilty of the offense of rape. Mr. Cobbins has consistently, throughout all of his statements, indicated that he was present at the scene of this crime. Mr. Cobbins has consistently stated that he was present when the victims in this case were abducted, although he claims, again, lack of knowledge, and that's basically his defense, lack of knowledge. Mr. Cobbins has consistently - - the proof shows that he returned to the house with the abducted couple.

This house, the proof shows, is a very small house. There's not much privacy in this house, and the activities that occurred in this house, [were] readily observable, or discernible, by anyone that's in the house. Mr. Cobbins indicated - - although he pled guilty to rape, indicated circumstances that gave rise to that - - I try to be delicate. I can't - - but the circumstances around - - that involve the alleged rape or the rape, were circumstances contrary - - let me put it that way, contrary to the proof that was offered by the medical examiner in this case, especially in the medical examiner's description of the injuries to the lip, which indicate to this Court a forcible act.

Mr. Cobbins' DNA was found on parts of the clothing . . . of the victim in this case. Mr. Cobbins testified that he watched as the other defendant strangled the victim. We know that strangulation was not the cause of death. We know that the cause of death was asphyxiation. We . . . know that the body was placed in a trash can. We know at the top of the trash can there was a piece of material that was a floral print, and we know that that floral print had been given from a friend of theirs to the defendant and his girlfriend. We know that the defendant stated that . . . he and his girlfriend slept on that floral print. We know that part of that floral print was found in and around the trash can. We know that part of that floral print was found at the scene where Mr. Newsom was found. We know Mr. Cobbins' fingerprints were found . . . on a magazine.

4

We know from the medical examiner's testimony that . . . she testified that it would have taken more than one person to have committed these offenses. We know from an independent witness that the independent witness saw what he appeared to think were four black males in the white SUV. There's other forensic evidence in this case placing Mr. Cobbins at the scene.

We know that Mr. Cobbins fled the scene to Kentucky. We know Mr. Cobbins was keeping aware of the events, and not in Knoxville but via the Internet. We know Mr. Cobbins asked another person to lie, another to state that they had left that place on an earlier date than . . . when the event occurred. We know that Mr. Cobbins - - when he was arrested, admitted that he gave . . . two statements in which he was not candid with the Court and he admitted on the stand that he had lied to law enforcement officers, and the importance of that is the credibility of Mr. Cobbins.

The Court has listened to his testimony and therefore had an opportunity to compare his testimony live with the written record in this case. I would have had no problem after listening to his tape . . . to have made assessments about his credibility in light of the other places that his testimony was contradicted to make the conclusion that his credibility was suspect.

And then we have to understand, as well that . . . all of the relating events with regard to Mr. Newsom, Mr. Cobbins was not convicted of [that] murder. He was [convicted] as a facilitator of those motions, which means he did not have the intent to commit murder or felony murder. He only had to provide substantial assistance in that murder. We know he was there when Mr. Newsom was brought in. We know that he drove a car back to the house when the couple had been abducted. We know that he was in the house, probably alone at some point in time, if the theory is correct, with Ms. Christian.

We know that he has pled guilty to the rape of Ms. [Christian]. We know that's a felony, and to be convicted  - - the [S]tate's theory has always been that all these defendants were criminally responsible for the conduct of the other. His admission of rape and in the death that ensued as a result, or later, would qualify or - - to meet the definition of . . . a death resulting from the commission of a felony.

In light of all these factors[,] plus the entire record in this case, the Court concludes that there is not an issue, although credibility . . . plays a part in every criminal trial, but the Court concludes that there's ample other physical

5

evidence in the record, ample other testimony in the record, that this Court can discharge its responsibility as the 13th juror, and this Court hereby accepts and approves the verdict of the jury as 13th juror.

The trial court rejected Defendant Cobbins' additional arguments for a new trial. Ultimately, the trial court stated that it was denying Defendant Cobbins' motion for a new trial, but the trial court reserved entering its order on the motion in order to give all of the defendants "access to what may be pertinent information that they could make an intelligent decision about whether or not there [are] reasonable grounds for them to pursue the issue of the competency of the trial judge . . . ." In so doing, however, the trial court stated that it "made it clear that [it does] not feel that there's . . . any issues that have been raised in this case that would justify the granting of a motion for new trial in this case." In conclusion, the trial court stated, "therefore, the entry of this order[,] which denies the motion for new trial on the grounds that I have just specified[,] will not be entered until after counsel has had an opportunity to review these materials . . . ."

On December 1, 2011, the trial court conducted a hearing regarding the defendants' motions and amended motions for new trial filed after review of the Tennessee Bureau of Investigation ("TBI") file. The trial court found that, as a result of the information included in the TBI file regarding the actions of former Judge Baumgartner, each defendant was entitled to a new trial. The trial court based its ruling upon the following grounds: (1) structural error and (2) the trial court's inability "to serve as thirteenth juror" given "the numerous issues concerning the credibility of both certain testifying witnesses and the trial judge." Regarding the thirteenth juror issue, the trial court stated the following:

> I tried my darn level best to act as the 13th juror in this case. I tried it in . . . Mr. Cobbins' case, and . . . I have read everything about this case. I have read every transcript. I have read it so many times, I am sick of reading it. I think I have it memorized. My first inclination when the Supreme Court called me and said, you got to do this, you got to take over this thing and handle this thing, first inclination came to me was, oh, what about those verdicts, and I got to do everything in my power to save those verdicts. I just got to. Got to.

> And . . . I think it's with that in mind that I ruled in the Cobbins case that as the 13th juror I could rule. But it was only after the Cobbins case that we began to read the entire TBI file. Up until that point[,] we had snippets. We had what they reported to me. I knew that there was going to be a problem, but boy, when that TBI file hit us, I realized that the responsibility was to this judicial system, and to the duties that are incumbent upon the judge,

6

and there is no way this Court can rule as a 13th juror with regard to any of these verdicts. Not only is there - - there may be credibility issues, they're credibility issues with this - - with Judge Baumgartner.

On December 5, 2011, the trial court entered a written order granting the defendants' motions for new trial. On the structural error issue, the trial court found that the "list of the trial judge's extensive and egregious actions during the time before, during, and after the times of the defendants' trials makes clear that the judge was utterly unqualified to preside over these trials." The trial court continued, "[t]he judge's extensive violations of criminal law and judicial ethics rendered the judge legally and ethically incompetent to preside over these trials, and in all likelihood[,] Judge Baumgartner's actions destroyed his ability to preside over these trials in an unbiased manner . . . ." Regarding the thirteenth juror issue, the trial court found that the defendants' trials "were beset by significant credibility concerns regarding both certain witnesses and the trial judge." In making that determination, however, the trial court neither identified nor explained specific instances that supported its concern regarding witness credibility. Also, the trial court had neither determined that witness credibility was the primary issue raised in any of these cases nor that sufficient credible evidence to support the verdicts had not been presented at trial. The trial court then concluded that, while it "had previously determined that it was able to serve as thirteenth juror in Mr. Cobbins' case, . . . any order denying Mr. Cobbins' motion for new trial relative to the thirteenth juror issue [was] hereby withdrawn."

On January 12, 2012, the trial court held a hearing and denied the State's application for an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. In so doing, the trial court stated the following:

> . . . I've said that I could not fulfill the function of the 13th juror because there are credibility issues involved in this case and that - - as well as the credibility of Judge Baumgartner, and I still hold, and I still find that that ruling is . . . the same today, and so even if I were to say that we ought to examine this structural error issue . . . by granting an appeal to the Court of Appeals, I still don't see how that would affect this Court's - - an appellate review of the 13th juror rule.

> I mentioned many times when I first was advised that I was going to be handling all of these cases my first response was to try to do everything I could to save these verdicts. I had that attitude when I heard the Cobbins case. When I heard the Cobbins case, however, I hadn't read the TBI file because the TBI file wasn't available to me at that time. It was only after the motion for a new trial that this Court reviewed the TBI file; and as a result of that

7

review, not only was Judge Baumgartner's credibility at issue, but the whole process made me nauseated, and so as a result of a review of that TBI file, I realized that this Court had to change its view with regard to its duty, and my duty was to try to enforce the law as I understood it to be and not as what I wanted it to be. What I wanted it to be was to save these verdicts. *What my responsibility was, was to follow the law and find this case was fatally flawed by the conduct of Judge Baumgartner*. (emphasis added).

On March 9, 2012, the trial court held a hearing "to address some issues that are still pending in this case that have to do with [the] Tennessee Bureau of Investigation's file," including issues regarding the "availability of the TBI records for public inspection." Ben Whitehouse, from the State of Tennessee Office of the Attorney General and Reporter, was present to "answer some questions that . . . [the trial court] [hadn't] been able to fully elucidate to the public about the availability of the TBI records for public inspection." The trial court discussed the existence of the TBI file, commenting that the trial court "doesn't read the TBI file before prosecution." The trial court continued, "[t]hat's because the Court's supposed to be fair and impartial. The Court's not a prosecutor, and we don't need to read . . . any investigative file. That's not part of what our job does." However, due to the obligation to provide evidence "pertinent to the defense in these cases," the trial court requested a copy of the TBI report "so that [the trial court] could perform [its] functions, to read that file to determine whether or not . . . there was - - we call it 'exculpatory evidence.'"

Judge Blackwood then stated his personal reaction to the contents of the full TBI report:

> Now, I've said this before, that when I read that, the entire TBI report, I was simply horrified. I had no idea . . . that that TBI report was going to reveal that Judge Baumgartner was in Chattanooga with Deena Castleman while they were supposed to be picking a jury in one of these car jacking cases, and we can just imagine what they were doing down there since Deena Castleman was supplying him with drugs. Had no idea that was going on. Had no idea that - - from what I base - - you can surmise from what was revealed of that TBI report that he was taking calls from her while he was on the bench or in chambers. Had no idea that . . . that was going to be revealed, and from a judicial standpoint, that just made my stomach sick. I mean, these horrible cases, important cases, and yet, we have a trial judge down there with his paramour or with his mistress, or whatever you want to call it, and we have great - - it doesn't take [a] vivid imagination to understand what was going on down there. That just made me sick.

8

Judge Blackwood further addressed his decision to grant judicial diversion to Judge Baumgartner, a decision made before he reviewed the TBI report:

> Let's face it, folks. Diversion was my call. Right or wrong, my call. You want to pull the - - you want to be mad at somebody, be mad at me. I made a wrong call or didn't make a wrong call. . . . I would have liked to have had a little bit more information. Whether or not that would have changed my opinion about what I should have done with Richard Baumgartner, I don't know. . . .
>
> After what I've read in this TBI report, believe me, the last person in my life I want to protect is Richard Baumgartner. . . .

On May 9, 2012, pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, the State filed an extraordinary appeal to the Tennessee Supreme Court.[3] The Tennessee Supreme Court granted the application and, on May 24, 2012, entered an order reversing the trial court's decision to grant new trials to the defendants. Regarding structural error, the Supreme Court concluded that it was "aware of no authority holding that a trial judge's misconduct outside the courtroom constitutes structural error when there is no showing or indication in the record that the trial judge's misconduct affected the trial proceedings." On the thirteenth juror issue, the Tennessee Supreme Court pointed out that "the successor judge did not find that witness credibility was the primary issue raised in the motions for new trial or that witness credibility was an overriding issue in these trials." The Supreme Court further stated that it was "aware of no authority holding that an original trial judge's credibility is an appropriate factor for a successor judge to consider when determining whether he is able to perform the thirteenth-juror review." The Tennessee Supreme Court concluded that "the successor trial judge erred by requiring new trials on the grounds of structural error and his inability to carry out the thirteenth-juror review due to credibility issues concerning the original trial judge." Accordingly, the Supreme Court remanded the cases to the trial court "for the successor trial judge to determine expeditiously, under the standards articulated herein, whether he is able to fulfill his duty to perform thirteenth-juror review."

Five days later, on May 29, 2012, at 8:51 a.m., without any prior order or any additional filings by the parties, Judge Blackwood sent an email to counsel for all parties, informing them that, "[p]ursuant to the Supreme Court mandate to act expeditiously, the Court will enter an order with the Clerk at 4:00 p.m." He stated that his "order will state that this Court cannot fulfill its duties pursuant to Rule 25, and is obligated to grant a new trial."

---

[3] Prior to that date, this Court, in a split decision, denied the State's extraordinary appeal under Rule 10.

Judge Blackwood stated that he would "be available at noon to discuss this matter." Later that morning, at 11:10 a.m., the State formally filed two motions in the Clerk's office: (1) a motion to continue "the noon hearing on the defendant's Motion for New Trial" because "some of the attorneys for the State [were] unavailable and out of the office" and (2) a motion for a hearing prior to the trial court entering an order, requesting "an opportunity to be heard on the defendant[s'] motions and the Court's ruling prior to the entry of an Order."

At 2:24 p.m. that afternoon, Judge Blackwood sent another email to counsel, stating, "After conferring with the Supreme Court, there was no mandate to conduct a hearing prior to the entry of the order. Consequently, this order will be entered as proposed in the Court's original email." Later that day, in an email sent at 4:06 p.m., Judge Blackwood informed counsel that he would not "enter the order granting a new trial until we all have an opportunity to discuss all these ramifications[.] There will be no further hearings regarding this order. The only question will be the timing of its entry." Later that same evening, at 5:15 p.m., an assistant to Judge Blackwood sent an email to counsel, informing them that "[t]he Court is taking the 2 motions filed by the State on May 29th out of the file since they are now moot. No public reference should be made to them." The email cited no authority for this action. At the time of this appeal, none of these emails had been made part of the public record.

On June 1, 2012, the State filed a motion for recusal, arguing:

The Court's actions and communications lead the State to reasonably question the impartiality of the Court. In particular, the State has grave concerns that the Court has engaged in conduct that is contrary to [the] spirit and letter of the Judicial Code[,] resulting in the State being denied its right to a fair trial.

The State argued that the trial court, following the remand from the Tennessee Supreme Court, should have allowed the State to be heard on the thirteenth juror issue and argued that it was improper for the trial court to "conduct[] its own investigation" when it consulted the Tennessee Supreme Court for guidance on the necessity of a hearing prior to the trial court's entry of an order. On June 4, the State filed an amended motion for recusal, which, other than including a "mistakenly omitted" exhibit, was "identical to the original motion."

On June 5, 2012, the trial court entered an order granting new trials to the defendants. In its order, the trial court concluded the following:

After a review as mandated by the Tennessee Supreme Court, this Court finds that it is unable as successor judge to perform those duties incumbent upon the Court because [of] its failure to preside at trial and other reasons.

10

The Court finds that credibility of the witnesses is an overriding and important issue which obligates this Court to conclude that it cannot perform the duties of the Thirteenth Juror.

The mandate of the Tennessee Supreme Court stated that if this Court is unable to perform the duties of the successor judge then this Court is obligated to grant the defendants a new trial.

This order did not specifically identify the witnesses whose credibility were "an overriding and important issue," nor did this order include a finding that sufficient credible evidence to support the verdicts had not been presented at trial.

On June 14, 2012, the State filed a second amended motion for recusal and motion to set aside the order granting new trials. Specifically, regarding the thirteenth juror issue, the State argued that the trial court had become "emotionally invested in granting new trials," making it "incapable of following the Tennessee Supreme Court's instruction in this case."

On that same day, Judge Blackwood held a hearing on the State's recusal motions. At the start of the hearing, Judge Blackwood reviewed the background and extent of his involvement in the cases, which included his knowledge of the investigation of the actions and behavior of Judge Baumgartner. Judge Blackwood also recounted a number of personal perspectives he experienced after TBI agents relayed the information concerning Judge Baumgartner to him. His initial thought was "[w]hat am I getting myself into?" He noted that he was in such a position because "[s]omebody had to do this terribly, untasteful job." He also mentioned that he presided over Judge Baumgartner's plea agreement, stating that "we all know about the infamous diversion that I gave him." He, however, pointed out that, "I didn't read the TBI report when I sentenced Judge Baumgartner" because it was not a part of the record. Rather,"I didn't even know if [the TBI report] had been compiled."

He elaborated further and stated the following:

But I knew about a lot that was in that TBI report. I knew a lot about Judge Baumgartner buying pills from Chris Gibson. I also knew a lot about Judge Baumgartner buying pills from Deena Castleman. But about the rest of what - - what was contained in that TBI report, I had no idea that that was in the report. And I was, as I've said before, shocked and dismayed when I read it.

I mean, I'll agree, you look back on that two-year diversion plea that I gave him, not knowing what was coming up . . . in the TBI report, I looked

11

like a fool. And I'll be the first to admit it. Now, whether that would have changed my opinion about what the sentence would have been, I don't know.

But I bring that up because that's the real first part where we start getting what I call the extraneous factors in all of this case. By extraneous factors in this case, I mean the pressure, a little bit of distrust, the little bit of, what's happening here? Are you telling me everything that's going on here? Or is somebody hiding something from me?

Because right after that plea, and all through the whole part of this episode, if you want to take a poll about who's the two most hated people in Knox County, Tennessee, me and Baumgartner are going to be running a close neck and neck.

. . . .

So, . . . I say, give me the TBI report and let me look at that TBI report and let me consider what might be in there that might be considered exculpatory evidence. And, of course, we know the bombshell that we hit. We find out all this stuff that everybody has reported.

I felt blindsided again. Not only did it raise some serious questions in my mind about how stupid I must have seemed to the public for . . . giving Baumgartner two years [diversion] probation; it seemed to me that there was a lack of communication about what should or should not have been turned over to various people.

Now, I'm going to tell you folks, when I read that TBI report, I got angry. I got disillusioned. And I got scared. Scared. I kept saying to myself, Jon Kerry, you may have some ethical problems here, buddy. You may have some problems here.

Regarding the original decision to act as thirteenth juror and accept the jury's verdict in Defendant Cobbins' case, Judge Blackwood yet again explained that there was a certain "mindset" at the time he came to that conclusion because "the hue and cry was, well, we got to do everything in our power to save those carjacking cases, everything in our power to save those carjacking cases." He stated that he read the record of Defendant Cobbins' case "with the sole purpose of saying, I'm going to do anything in my power to save this verdict. If I'm wrong, the Appellate Court's going to do it, but . . . it ain't going to be me, man. It ain't going to be me." He then acknowledged that he had a "preference for what I wanted to do"

regarding Defendant Cobbins' case.

More importantly, Judge Blackwood continued by explaining that, when he first read the State's motion for recusal, he had the following reaction:

> . . . I jumped up, did about three cartwheels, said, yeah, yeah, yeah. My time. My time, baby. Because I'm going to come in here and I'm going to tell it - - I'm going to tell it like nobody's ever heard it before. I'm going to finally do what my daddy told me to do a long time ago and tell it from my standpoint, tell it like it is, boy. And I'm going to go in here and I'm going to embarrass, I'm going to humiliate, and I'm going to make this like the Jerry Springer Show. The Jerry Springer Show is going to be mild compared to what I was going to do at this Motion to Recuse.
>
> By the time we got through letting out blood in this hearing, it would have reminded everybody of Achilles' death at the hands of Hector and the carrying of his body around the City of Troy. Yes, sir, my day had finally come. Boy, I was going to get a lot of angst off my chest.
>
> I . . . left my office yesterday all geared. You can't believe the preparation that my office has done, but . . . we got it. I ran into a colleague of mine, a man that I respect and admire, as I was walking out the door. . . .
>
> And we chatted for a while. And we've both devoted many, many years to the judiciary and this system. . . . And we talked about our reverence for what we do, or try to do in this courtroom.
>
> And I appreciated his conversation, because when I went home, I sat down . . . , I started going over all the things that I was going to say that was going to cause all this blood to run red all over this courtroom, all this embarrassment I was going to cause. And then I got to thinking, I might embarrass a lot of people, but the main person I was going to be embarrassing would be me and this judicial system. . . . I'm not going to do it.
>
> . . . .
>
> Having said that, . . . when I assumed the duties of a judge, I have piloted what I think is a ship, a ship of state. And I can promise you, that in this court, in every court I've ever been in, there hadn't been but one captain of that ship and that captain's been me.

13

And I intend to be the captain of this ship.  And I intend to run this ship.  I'm here by appointment by the Supreme Court.  And until the Supreme Court tells me otherwise, I'm not leaving.

. . . .

But I'm still at the helm, and I'm going to be at the helm.  And you can take all those phone calls, all those types of intimidation and you can just chalk them up, baby.  It ain't moving this boy.

Judge Blackwood continued his personal reflections by explaining that the "issues have been hard in every ruling" in this case.  He commented that "[i]t has been hard to distinguish where the head ruled or was it the heart that ruled."  He disclosed his personal thoughts on the pending recusal motion, stating that "I'm going to be here.  And I've seen this Motion to Recuse, and it's not going to be granted."

Judge Blackwood continued his musings, again in personal terms, explaining the remand from the Tennessee Supreme Court and detailing the reasons for the decision to deny a hearing to address the issues in that remand:

So, we finally get to the Supreme Court decision in this case, which says, basically, Blackwood, you are wrong.  There was no structural error in this case.  Blackwood, you were right, he didn't act as a 13th juror.  And the last paragraph, it says, go back down there, Blackwood, you need to reexamine this case under the guidelines that we just said.  That's what it said.

Now, nowhere in that last paragraph did it say, Blackwood, you go down there and you have a hearing.  If you can find that in that last paragraph, point it out to me and I'll be glad to take a second look at it.  But it doesn't say that . . . . Before I did anything, I checked with the Supreme Court.  I'm not no dummy - - well, maybe . . . I am.  But at least I know who to check with and say, am I supposed to have a hearing on this?  And the Supreme Court [said], no, you're not.  Do what we told you to do.  And I did what I - - we did - - thought we were supposed to do.

Judge Blackwood then stated that he alerted the parties of his impending decision by email rather than a public order for the purpose that the "families" would not first learn of its grant of new trials "from the newspapers."

Regarding his decision to remove the State's two May 29, 2012 motions from the

14

court file and his email instruction that the parties make no public reference to the motions, Judge Blackwood offered his justification of his actions based upon "no hearing [being] set," so there was no hearing to continue. He expressed concern that the defense attorneys would file responses to the motion to continue, which would "get in the paper." Thereafter, he decided to "just take [the motions] out" of the file and place them "in an envelope" in the clerk's office. He claimed that he took such actions because he didn't "want a leak coming out that there's something out there that we [didn't] need to deal with." Judge Blackwood explained that his "overriding concern about emails and all this other stuff was to protect what I thought would be innocent people who were going to get hurt if leaks got out or stuff got out that shouldn't be out there."

Thereafter, Judge Blackwood stated that he would "not grant the State a hearing on the 13th juror rule" because he did not believe the State was "entitled" to a hearing. He, however, decided that he would "reexamine" his grant of new trials for Defendant Davidson and Defendant Cobbins. Even after the Supreme Court's directives, he stated that, although "it's hard to separate this Baumgartner crap from the 13th juror" issue, he was "going to do it with the idea of putting away the Baumgartner crap." Judge Blackwood said that he would not reexamine his new trial grant for Defendant Thomas because "my head tells me that my heart had no part in Thomas." He, however, promised that he would "go back and make sure this Court's decision on the 13th juror rule in those other two cases were based on the head and not the heart."

Lastly, in this hearing, Judge Blackwood spoke about "a Canon of Ethics called 8.2," informing the parties that "[a] lawyer shall not make a statement that the lawyer knows to be false if that is made with reckless disregard as to its truth or falsity concerning the qualifications or the integrity of the following persons. And number one, that is a judge."

The following colloquy then transpired between the trial court and the parties:

> [THE COURT:]     And I didn't particularly want to bring this up here today, since you . . . insist that I do so, not too long ago, there was a newspaper article in the *Knox News Sentinel* that went back to these blooming e-mails. In that email, there was a statement made, Judge Blackwood hates the Knox New[s] Sentinel. We believe he is engaging - - or I don't - - can't quote it at all, whatever it is - - but we believe he is engaging in ex parte communications with the defendants, or something to that effect.
>
> Now, if you have one blooming e-mail, one blooming e-mail to support that charge, that this Court . . . had been dealing with ex

15

parte communications with these defense attorneys, you better bring it forward. Or if you don't, the person that made that statement better self-report. Now, that's the first thing I've got to say.

[GENERAL] NICHOLS: And who do you think that is?

THE COURT: I think it's John Gill.

[GENERAL] NICHOLS: So you're going to report General Gill to - -

THE COURT: I am not going to report - -

[GENERAL] NICHOLS: - - is that what you're going to do?

THE COURT: I'm not going to report John Gill. I am saying that it better not happen again.

Now, sit down.

[GENERAL] NICHOLS: So, we're going to base all this - -

THE COURT: You're going to sit down.

Now, the second thing - - and this is simply rumor, but it bothers me to death.

[GENERAL] NICHOLS: And we object to you saying anything more - -

THE COURT: And I told you to sit down. And if you get up one more time, you will be in contempt of this Court. You understand me?

There is a rumor floating around that Blackwood is dirty. I can't trace the exact source of that rumor, but if you have any evidence, anybody wants to say that, you better be able to prove it.

Court is adjourned.

[GENERAL] PRICE: Your Honor, we'd like to make an offer of

16

proof.  Do you want to hear that, or are you just going to - -

THE COURT:        Put it in the record.

[GENERAL] PRICE:        Thank you.

(The Judge left the bench.)

The trial court's mention of "that email" references an email sent on March 7, 2012, from Special Counsel John W. Gill, Jr., in the Knox County District Attorney General's Office to Assistant Attorney General Ben Whitehouse in the Office of the Attorney General and Reporter, which included the following text:

Ben - this is apparently what the judge is talking about.  He sent out an email today at noon stating as follows:

"Please be advised that the Court will address the TBI file on Friday at 12:00 in Division I Courtroom."

The email went to all lawyers in the Christian-Newsom cases and the lawyer in the Jason Bailey case.  So we don't have any idea what it is all about.  We filed the stipulation last week.  It is essentially the same stipulation as the parties agreed to in the hearings on whether to grant a new trial[] in Christian-Newsom, except we included safe guards against the judge not giving us a chance to put on evidence after his rulings on admissibility and relevance before he issues his opinion.  That [is] what he did last time.

Blackwood hates the New[s] Sentinel and I fear he is playing fast and loose with off the record emails and other communications he states are to avoid the newspaper from knowing.  Below is an editorial from this Sunday and a story last week that may be relating to the setting on Friday.  Please not[e] in the article I have annotated in italics.  This reporter typically decides what the story is and then ignores all information to the contrary and is particularly disliked by Blackwood.

For further clarification, Special Counsel Gill explained the prior email in a subsequent affidavit executed on July 24, 2012:

The [prior] email was in response to [General Whitehouse's] inquires about why Judge Jon Kerry Blackwood had asked him to attend a hearing in

17

Knoxville on March 9, 2012. In this email, I did not state that Judge Blackwood had ex parte communication with anyone in the cases involving the homicides of Channon Christian and Christopher Newsom. I have no knowledge of, and have never heard of anything to indicate, that any such ex parte communications had occurred.

After the trial court left the bench, the State, with defense counsel present, submitted exhibits as part of its offer of proof on the motion for recusal.[4]

On June 19, 2012, the trial court signed an order, which it filed on June 20, 2012, giving the State "five days from the date of this Order to file any documents or additional exhibits to its amended motion to recuse." The trial court further stated that "[t]he defendants will be given thirty days to file any response to the motion to recuse or amended motion. The final hearing on the motion and amended motion to recuse will be October 8, 2012." In the order, the trial court acknowledged that in the hearing conducted on June 14, 2012, it "stated that it would not recuse itself but would review the trial transcripts in State v. Cobbins and State v. Davidson to insure that its ruling that the Court could not perform its duties pursuant to Rule 25(b) was not based upon its previous reference to structural error and the conduct of Judge Baumgartner." The trial court then stated that it "will conduct the review of these transcripts and will file its order concerning this review on August 17, 2012." Lastly, as a result of the trial court's continued review of the trial transcripts from Defendant Cobbins' and Defendant Davidson's respective cases, it ordered that the previous order granting those defendants new trials "shall be held in naught." The trial court, however, continued, "[t]he Order granting a new trial to [D]efendant George Thomas is granted by virtue of the previous order entered in this cause."[5]

On June 20, 2012, the trial court signed and entered a "corrected" order, modifying a phrase from the previous order that referenced the trial court's statements at the June 14, 2012 hearing regarding recusal. In the previous order, the trial court wrote the following: "The Court stated that it *would not recuse itself* but would review the trial transcripts . . . ." (emphasis added). In the "corrected" order, the trial court changed the wording of that phrase to "[t]he Court stated that it *would not rule on the recusal issue itself* but would

_____

[4] The State entered exhibits, enumerated A through P, as an offer of proof to the hearing and in support of its motion for recusal. Copies of those exhibits were not included in the record on this appeal.

[5] After the trial court affirmed its previous grant of a new trial to Defendant Thomas, the State filed a timely application for interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. The trial court issued no decision regarding that interlocutory appeal before this Court stayed all proceedings in order to address the present matter; therefore, the application for a Rule 9 interlocutory appeal remains pending.

review the trial transcripts . . . ." (emphasis added).

On July 24, 2012, the State filed a new motion for recusal, acknowledging that "it has filed a prior motion to recuse, however, the present pleading represents a distinct and separate motion to recuse based on matters occurring subsequent to the filing of the first motion to recuse, primarily concerning the Court's statements at the June 14, 2012 hearing." Accordingly, the State represented "that this motion is not being presented in order to harass, cause unnecessary delay, needlessly increase the cost of litigation, or for any other improper purpose." In the new motion for recusal, the State contended that "recent admissions raise fresh concerns about the Court's impartiality," referencing several statements the trial court made at the motion for recusal hearing held on June 14, 2012. The State further alleged that the trial court's "highly emotional reaction to the State's first motion to recuse" caused it "concern about the Court's impartiality." Lastly, the State argued that the trial court contradicted the record, referencing the trial court's previous removal of motions from the court file, its refusal to allow the State to obtain an audio recording of the June 14, 2012 hearing,[6] and the trial court's orders from June 19, 2012, and June 20, 2012, "that appear to be in direct conflict with the Court's oral remarks at the hearing."

Also, on July 24, 2012, District Attorney General Randall E. Nichols executed an affidavit, stating that the following occurred at the June 14, 2012 hearing:

I am the District Attorney General for the Sixth Judicial District, Knox County, Tennessee. I attended the June 14, 2012 hearing that was scheduled by the Court to address the State's motion to recuse. During a break in the

---

[6] On July 25, 2012, Assistant District Attorney General Leland L. Price executed an affidavit, which addressed the State's request for a copy of the audio recording of the June 14, 2012 hearing.

The affidavit stated the following:

I am an Assistant District Attorney General with the Knox County District Attorney General's Office. Shortly after the June 14, 2012 hearing on the State's Motion to Recuse, I contacted Kristi G. Barron, the Court Reporter who had recorded the hearing. I requested a transcript of the hearing as well as a copy of the audio recording. Ms. Barron later contacted me and said she would not be able to provide me with a copy of the audio recording. She stated that Judge Jon Kerry Blackwood had instructed her not to provide an audio recording.

After my oral request had been denied, Assistant District Attorney General Ta Kisha Fitzgerald prepared a written motion request for a copy of the audio recording. This was filed on June 19, 2012. As of the undersigned date, the State has not received a ruling from Judge Jon Kerry Blackwood on the written motion.

proceedings, I was approached by Ray Vineyard, a court security officer. He informed me that Judge Blackwood wished to see the attorneys for the State and the defendants in chambers. I asked Officer Vineyard to relay to the Court that the State respectfully declined to meet with Judge Blackwood in chambers. A few minutes later, Officer Vineyard returned. He stated that Judge Blackwood had instructed him to tell me to "get my ass back there." I again declined. When the Court returned from the recess, he appeared to be highly agitated.

On August 20, 2012, the trial court held a hearing on the State's new motion for recusal. The trial court allowed the parties to present their arguments. Although the trial court minimized its discussion of the arguments during the presentations, it briefly responded to various arguments by the State. The trial court ended the hearing by stating that "the new rules [regarding recusal motions] require that the Court make a finding of fact and conclusions of law and the Court will do that some [sic] in support of its decision to deny the Motion to Recuse."

On September 7, 2012, Judge Blackwood filed an order denying the State's new motion for recusal. In the order, he recounted "the timetable of this Court's involvement in this case" and his reaction to the TBI report. Judge Blackwood stated that, when he reviewed the transcripts of the trials in preparation for the December 1, 2011 hearing on the motions for new trial, he "realized that when the Court originally undertook this process, affirming the jury verdict was predominant in its thought process." Regarding his decision to grant new trials at that December hearing, Judge Blackwood gave the following explanation:

> Unfortunately, this Court made a statement that indicated that as a part of its thirteenth juror analysis, the Court considered Baumgartner's credibility. That was a clear error and the Court did not intend to imply that the Court must evaluate the trial court's credibility as part of the thirteenth juror analysis. This Court meant that Baumgartner's credibility regarding his ability to make trial court rulings was an issue.

Addressing events that took place after the Tennessee Supreme Court entered its order remanding the case to the trial court, Judge Blackwood stated the following as an explanation of his decision to remove two motions subsequently filed by the State from the court file:

> Since the Supreme Court had not ordered a hearing, there was no proceeding to continue. The Court told the Clerk to take that pleading out of the file since, if it was discovered by the media, the Court's ruling pursuant to the Supreme Court's decision might be prematurely reported. At the time that the Court

20

ordered the Clerk to remove that pleading from the file, an Assistant Attorney General was present with the Court when the directive was given.

Regarding the State's assertion that the trial court "lost its objectivity on the thirteenth juror rule," Judge Blackwood candidly acknowledged that "Baumgartner's misdeeds have disgusted this Court." He, however, concluded that he had not "lost [his] objectivity in this case." He stated that he could not perform his duties as thirteenth juror "in large part because of the concept of criminal responsibility." Judge Blackwood also stated that "the Court made unfavorable rulings against the State, but such rulings are not grounds for recusal." Judge Blackwood ultimately concluded that "a person of ordinary prudence in the Court's position, knowing all the facts known to the judge[,] would not find a reasonable basis for questioning the judge's impartiality and denies the State's motion."

It is from this judgment that the State now appeals.

## II. Analysis

On appeal, the State argues that a reasonable person of ordinary prudence in the trial court's position, knowing all the facts known to the trial court, would find a reasonable basis for questioning the trial court's impartiality. Specifically, the State contends that a reasonable person of ordinary prudence in the trial court's position would find a reasonable basis for questioning the trial court's impartiality in its assessment of the thirteenth juror issue in these cases. Defendants Cobbins, Davidson, and Thomas counter that the trial court remained objective throughout the proceedings and properly denied the State's motion to recuse.

### A. Standard of Review

As an initial matter, we address the standard by which this Court reviews petitions for recusal on appeal. Pursuant to Tennessee Supreme Court Rule 10B, section 2.01, a party is entitled to an "accelerated interlocutory appeal as of right" from an order denying a motion for disqualification or recusal. As amended, effective July 1, 2012, Tennessee Supreme Court Rule 10B, section 2.06, directs this Court to review the appeal "on an expedited basis based upon a de novo standard of review." Prior to July 1, 2012, the appellate courts reviewed recusal decisions pursuant to the more deferential abuse of discretion standard. *See State v. Hester*, 324 S.W.3d 1 (Tenn. 2010). Because the State's motion for recusal was filed on July 24, 2012, this Court will review the appeal under the new de novo standard.

We recognize that the State filed a recusal motion prior to July 1, 2012. The trial court, however, never entered a ruling on that recusal motion. Therefore, because the trial

21

court never resolved the prior motion for recusal, that motion would not be properly before this Court for review. Even if the trial court had denied that motion, we still would conclude that the motion at issue in this appeal should be reviewed under the new de novo standard.[7]

In *Kathryn A. Duke v. Harold W. Duke, III*, the Court of Appeals considered a "renewed motion for recusal," which was filed in August 2012. No. M2012-01964-COA10B-CV, 2012 WL 4513613, slip op., at 2 (Tenn. Ct. App. October 2, 2012). The Court of Appeals concluded the following:

> The foregoing notwithstanding, Rule 10B does apply to a motion for recusal filed after July 1, 2012; provided the alleged grounds persist, they come under the purview of the new Rules of Judicial Conduct and Tennessee Supreme Court Rule 10B, and there has been no prior appeal on those grounds.

*Id.* at 3. We agree with the Court of Appeals on this issue.[8]

For all of these reasons, we now proceed with a de novo review of the motion at issue in this appeal.

## B. Statement of Law

This Court has long observed that "'[i]f the public is to maintain confidence in the judiciary, it is required that cases be tried by unprejudiced and unbiased judges.'" *Smith v. State*, 357 S.W.3d 322, 340 (Tenn. 2011) (quoting *State v. Rimmer*, 250 S.W.3d 12, 37 app. (Tenn. 2008) (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994))); *see also State v. Reid*, 213 S.W.3d 792, 815 (Tenn. 2006) ("'[T]he preservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial.'") (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998)). The Tennessee Supreme Court affirmed this principle many years ago, stating that "it is of immense importance, not only that justice shall be administered . . . , but that [the public] shall have no sound reason for supposing that it is not administered. It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice." *In re*

---

[7] Additionally, this Court notes that, under either the abuse of discretion standard or the de novo standard, the record on appeal warrants the same conclusion that we have reached in this opinion.

[8] Further, we highlight that all of the parties in these three cases agreed that the correct standard of review is de novo.

22

*Cameron*, 151 S.W. 64, 76 (Tenn. 1912).

"A judge should grant a motion to recuse 'when the judge has any doubt as to his or her ability to preside impartially in the case or when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Smith*, 357 S.W.3d at 341 (quoting *Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009) (citation omitted)); *see also Alley*, 882 S.W.2d at 820. A judge's duty to recuse springs from a constitutional source; Article VI, section 11 of the Tennessee Constitution provides that "[n]o Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested. . . ."

The Tennessee Supreme Court has explained that "[t]he purpose of Article 6, § 11 of our Constitution is to insure every litigant the cold neutrality of an impartial court." *Leighton v. Henderson*, 414 S.W.2d 419, 421 (Tenn. 1967). The Supreme Court also has observed that "[t]his provision is intended 'to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion because of interest, partiality, or favor.'" *Bean*, 280 S.W.3d at 803 (quoting *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002)). Tennessee Code Annotated section 17-2-101 similarly provides that "[n]o judge or chancellor shall be competent, except by consent of all parties, to sit in the following cases: (1) Where the judge or chancellor is interested in the event of any cause." Furthermore, under the Code of Judicial Conduct, "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances: (1) the judge has a personal bias or prejudice concerning a party or a party's lawyer. . . ." Tenn. Sup. Ct. R. 10(2.11)(A). A judge is required to perform the duties of judicial office without bias or prejudice. Tenn. Sup. Ct. R. 10(2.3)(A). "A judge shall not be swayed by partisan interests, public clamor or fear of criticism." Tenn. Sup. Ct. R. 10(2.4)(A).

Perhaps most importantly, a trial judge should recuse himself or herself whenever the judge has any doubt as to his or her ability to preside impartially or whenever his or her impartiality can reasonably be questioned. *Pannell v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). "Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001); *see also Alley*, 882 S.W.2d at 820. The appearance of impropriety is conceptually distinct from the subjective approach of a judge facing a possible disqualification challenge and does not depend on the judge's belief that he or she is acting properly. *See Liteky v. United States*, 510 U.S. 540, 553, n.2 (1994) ("The judge does not have to be subjectively biased or prejudiced, so long as he appears to be so.").

This Court certainly acknowledges that not every bias, partiality, or prejudice merits recusal. *Alley*, 882 S.W.2d at 821. "To disqualify, prejudice must be of a personal character, directed at the litigant, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case." *Id.* (internal quotation omitted). "If the bias is based upon actual observance of witnesses and evidence given during the trial, the judge's prejudice does not disqualify the judge." *Id.* (citation omitted). "However, if the bias is so pervasive that it is sufficient to deny the litigant a fair trial, it need not be extrajudicial." *Id.* (citation omitted). Further, "[a]dverse rulings by a trial court are not usually sufficient grounds to establish bias" and "[r]ulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." *Id.* (citations omitted).

This Court, however, has held that "[w]hen a trial court's comments indicate that the judge has prejudged factual issues, Tennessee courts have required disqualification." *Id.* at 822. The Tennessee Supreme Court made clear that "'[i]n the trial of any lawsuit[,] the judge must be careful not to give an expression to any thought, or to infer what his opinion would be in favor or against either of the parties in the trial.'" *Id.* (quoting *Leighton*, 414 S.W.2d at 420) (the Tennessee Supreme Court reversing and remanding for new trial because the trial court stated, among other things, "I don't care what proof is in the record, if the Governor doesn't pardon this man, I am going to grant the petition. . . . ")).

### C. Application to the Present Cases

After a thorough review of the record before us, we must conclude that a person of ordinary prudence in the trial court's position, knowing all the facts known to the trial court, would find a reasonable basis for questioning the trial court's impartiality on two specific issues: its assessment of the thirteenth juror issue and the trial court's ability to be fair to the State as a party in future proceedings involving these three defendants. For the reasons discussed below, we are compelled to conclude that the trial court erred in denying the State's new motion for recusal.

### 1. Thirteenth Juror

Throughout the various stages of the proceedings in these three cases, the trial court has come to different conclusions regarding its ability to act as thirteenth juror pursuant to Rule 25(b) of the Tennessee Rules of Criminal Procedure. As detailed below, with each decision, the trial court provided different explanations, some detailed and lengthy and others offering little, if any, insight into the trial court's reasoning.

At the June 9, 2011 hearing on Defendant Cobbins' motion for new trial, held shortly

24

after Judge Blackwood was assigned to these cases, the trial court stated that it "could discharge its responsibility as the 13th juror," and it "hereby accept[ed] and approve[d] the verdict of the jury as 13th juror." The trial court stated that it came to this conclusion after reviewing the transcripts, considering the evidence presented at trial, and listening to an audio recording of Defendant Cobbins' testimony. The trial court offered, on the record, a detailed and extensive analysis of the facts and applicable law that formed the basis of its decision, which it made before reviewing any information included in the TBI file. In its findings, the trial court specifically addressed the credibility of Defendant Cobbins, concluding that Defendant Cobbins testified "consistently[] throughout all of his statements" and that it would "have no problem after listening to his tape . . . to have made assessments about his credibility in light of the other places that his testimony was contradicted to make the conclusion that his credibility was suspect." In addition, the trial court stated that, because of the "ample other physical evidence in the record, ample other testimony in the record," it could act as thirteenth juror in Defendant Cobbins' case.

Then, on December 1, 2011, Judge Blackwood conducted a hearing on all the defendants' motions and amended motions for new trial. Preliminarily, we note that Judge Blackwood made statements at this hearing which could lead a reasonable person to question his impartiality from the outset of the time he took over as the trial judge in these cases. Judge Blackwood stated as follows:

> My first inclination when the Supreme Court called me and said, you got to do this, you got to take over this thing and handle this thing, first inclination came to me was, oh, what about those verdicts, and I got to do everything in my power to save those verdicts. I just got to. Got to.

He then reiterated these feelings in detail at the January 12, 2012 hearing and again at the hearing on June 14, 2012. At this later hearing, Judge Blackwood stated that he had read the record of Defendant Cobbins' case "with the sole purpose of saying, I'm going to do anything in my power to save this verdict. If I'm wrong, the Appellate Court's going to do it, but . . . it ain't going to be me, man. It ain't going to be me."

Moreover, he dramatically changed course in this hearing as to Defendant Cobbins, and decided to grant the motions for new trial as to all three defendants. The record does not indicate any new evidence presented to Judge Blackwood between these two hearings other than the TBI report detailing the misconduct of Judge Baumgartner. By the time this hearing occurred, Judge Blackwood had reviewed the TBI report regarding former Judge Baumgartner's misconduct, later candidly admitting that the contents of the report made him "nauseated," "horrified," and "sick." At this point, Judge Blackwood erroneously based his decision to grant new trials on "credibility issues with . . . Judge Baumgartner." Furthermore,

in his order, Judge Blackwood offered no explanation whatsoever as to how or why his assessment of witness credibility in Defendant Cobbins' case had changed, only stating generally that the defendants' trials "were beset by significant credibility concerns regarding both certain witnesses and the trial judge." Judge Blackwood never identified these "certain witnesses" and never explained the issues involved in these "significant credibility concerns."

We acknowledge that, in his September 7, 2012 order denying the State's motion for recusal, Judge Blackwood stated that he made an "error" at the December 1, 2011 hearing and "did not intend to imply that the Court must evaluate the trial court's credibility as part of the thirteenth juror analysis." Assuming, based on this statement by Judge Blackwood, that he did not intend to rely on Judge Baumgartner's lack of credibility as a factor to be considered in his analysis of the thirteenth juror issue, it is difficult to understand his failure to undertake the type of detailed and extensive analysis of the records that he undertook in his initial denial of Defendant Cobbins' motion for new trial and that would be required to decide the thirteenth juror issue on a basis other than Judge Baumgartner's credibility.

On the State's appeal of the trial court's decision, the Tennessee Supreme Court reviewed the trial court's decision to grant new trials and concluded that it erred because it considered the "original trial judge's credibility . . . when determining whether [the trial court] is able to perform the thirteenth-juror review." On May 24, 2012, the Thursday before the Memorial Day weekend, the Supreme Court issued an order that vacated the trial court's grant of new trials and remanded the cases to the trial court for reconsideration of its ability to perform the duty of thirteenth juror. The clear mandate of this opinion required the trial judge to thoroughly review the trial records for all three defendants before it ruled on the thirteenth juror issue. At 8:51 a.m. on May 29, 2012, less than five full days after the Supreme Court's decision and on the Tuesday morning after the long weekend, Judge Blackwood informed all counsel by email, as opposed to the filing of a public order, that he "cannot fulfill its duties pursuant to Rule 25, and is obligated to grant a new trial," that he would "be available at noon to discuss this matter" with the parties, and that he would file an order later that day stating its decision.

Later that morning, clearly in response to this email, the State formally filed two motions: (1) a motion to continue "the noon hearing on the defendant's Motion for New Trial" because "some of the attorneys for the State [were] unavailable and out of the office" and (2) a motion for a hearing prior to the trial court entering an order, requesting "an opportunity to be heard on the defendant[s'] motions and the Court's ruling prior to the entry of an Order." That same afternoon, Judge Blackwood sent another email to counsel, stating that "[a]fter conferring with the Supreme Court, there was no mandate to conduct a hearing prior to the entry of the order. Consequently, this order will be entered as proposed in the

26

Court's original email." Later that day, in an email sent at 4:06 p.m., Judge Blackwood informed counsel that he would not "enter the order granting a new trial until we all have an opportunity to discuss all these ramifications[.] There will be no further hearings regarding this order. The only question will be the timing of its entry." Then, early that same evening, without citation to any authority, an assistant to Judge Blackwood sent the final email of the day to counsel, informing them that "[t]he Court is taking the 2 motions filed by the State on May 29th out of the file since they are now moot. No public reference should be made to them." On June 5, 2012, Judge Blackwood entered an order granting new trials to the defendants, without further explanation, simply concluding, in general terms, that "[t]he Court finds that credibility of the witnesses is an overriding and important issue which obligates this Court to conclude that it cannot perform the duties of the Thirteenth Juror." The order did not identify any witnesses or any particular issues upon which witness credibility was "an overriding and important issue."

Although this Court acknowledges that the Tennessee Supreme Court directed the trial court to act "expeditiously" in its decision, Judge Blackwood did not indicate what, if any, measures he took to further review the lengthy and complex records from the three separate trials of the defendants. Even if we were to assume that he was relying upon a prior review of the records of these three trials, he failed to make the type of detailed and extensive findings on the thirteenth juror issue that he had previously made in Defendant Cobbins' case. Rather, on the morning of the first business day after a holiday weekend, Judge Blackwood announced privately to counsel that he could not act as thirteenth juror, giving no further explanation or reasoning. He refused to schedule any further public hearings on the matter and even went to the extent of removing motions requesting such from the record. Although the order from our Supreme Court did not expressly require additional hearings, it was certainly reasonable for the State to request a hearing, given the Supreme Court's ruling on the thirteenth juror issue. Based upon the Supreme Court's decision, witness credibility was the key issue to be examined. Accordingly, it is reasonable to assume that both sides would want to be heard on this crucial issue before the trial court ruled.

We further find it troubling that in later proceedings, Judge Blackwood continued to waiver on his ability to act as thirteenth juror, deciding to "reexamine" his grant of new trials to Defendant Davidson and Defendant Cobbins to make sure he separated the thirteenth juror issue from the "Baumgartner crap." Judge Blackwood, however, declined to reexamine his new trial grant for Defendant Thomas because "my head tells me that my heart had no part in Thomas." Judge Blackwood drastically changed his position on more than one occasion, and he never offered a detailed explanation to support his determination that witness credibility was an overwhelming factor in his inability to act as thirteenth juror in all three of the defendants' cases. In his September 7, 2012 order denying the State's recusal motion, Judge Blackwood stated, without any further elaboration, that "[t]he Court has concluded that

it cannot perform these duties in large part because of the concept of criminal responsibility." Our detailed review of the transcripts of the hearings in these cases and our meticulous review of the record as a whole has failed to disclose a single instance in which the trial court has specified the "witness credibility" issues that arguably preclude the trial court from exercising its role as thirteenth juror. Moreover, we are aware of no authority that the mere fact that a case is based in part on the theory of criminal responsibility has any impact upon the issue of whether a successor judge can act as thirteenth juror.

As a result of the combination of the timing of the trial court's decision after the Supreme Court's remand, its lack of a meaningful explanation for its purported credibility decision reversal, and its drastic changes on a final resolution of the thirteenth juror issue, this Court cannot conclude that the trial court has been able to fairly determine the thirteenth juror issue solely through sound consideration of proper legal standards, free from any influence of former Judge Baumgartner's misconduct. We are compelled to conclude that the trial court's objective ability to assess witness credibility appears to have been tainted by its disgust for the contents of the TBI file. The trial court's overriding focus on the contents of the TBI report causes this Court to question the trial court's perceived impartiality in its assessment of the thirteenth juror issue. Therefore, based upon the objective standard for recusal, we conclude that a reasonable person of ordinary prudence in the trial court's position, knowing all facts known to the trial court, would find a reasonable basis for questioning the trial court's impartiality in its assessment of its role as thirteenth juror. Accordingly, the trial court erred by denying the State's motion for recusal.

### 2. Fairness to the State in these Three Cases

Additionally, in our view, the impartiality of the trial court toward the State in these three cases can reasonably be questioned. On more than one occasion, Judge Blackwood voiced, on the record, his negative reactions to various motions filed by the State in these cases.

As mentioned in the prior analysis, after the Tennessee Supreme Court remanded the cases to the trial court for reconsideration, the State filed two motions after it was informed by email that Judge Blackwood planned to once again grant new trials to the defendants. In response to the State's motions, Judge Blackwood had his assistant send an email to counsel, informing them that "[t]he Court is taking the 2 motions filed by the State on May 29th out of the file since they are now moot. No public reference should be made to them."

Second, at the June 14, 2012 hearing on the State's original motion for recusal, Judge Blackwood elaborated on his reaction to the State's motion for recusal:

. . . I jumped up, did about three cartwheels, said, yeah, yeah, yeah. My time. My time, baby. Because I'm going to come in here and I'm going to tell it - - I'm going to tell it like nobody's ever heard it before. I'm going to finally do what my daddy told me to do a long time ago and tell it from my standpoint, tell it like it is, boy. And I'm going to go in here and I'm going to embarrass, I'm going to humiliate, and I'm going to make this like the Jerry Springer Show. The Jerry Springer Show is going to be mild compared to what I was going to do at this Motion to Recuse.

By the time we got through letting out blood in this hearing, it would have reminded everybody of Achilles' death at the hands of Hector and the carrying of his body around the City of Troy. Yes, sir, my day had finally come. Boy, I was going to get a lot of angst off my chest.

Although Judge Blackwood stated that he would not "cause all this blood to run red all over this courtroom," the fact remains that he clearly had plans to "embarrass" and "humiliate" the State for questioning his continued involvement in the cases.

Third, according to an affidavit from District Attorney General Randall E. Nichols, the State declined to participate in in-chamber discussions during a break in the proceedings at the June 14, 2012 hearing. As a result, Judge Blackwood instructed General Nichols to "get [his] ass back [to the chambers]." General Nichols declined. Proceedings resumed at the hearing, during which a heated exchange occurred between General Nichols and Judge Blackwood, in which Judge Blackwood clearly indicated that his integrity had been questioned by the State. Judge Blackwood claimed that an email from Special Counsel John W. Gill, Jr., accused him of conducting ex parte communications.[9] Judge Blackwood sternly stated that if the State had "one blooming e-mail, one blooming e-mail to support that charge" then the State "better bring it forward." Judge Blackwood continued, stating that "the person that made that statement better self-report" to the Board of Professional Responsibility. After an intense debate between General Nichols and Judge Blackwood on that issue, Judge Blackwood threatened to hold the district attorney "in contempt of this Court," and Judge Blackwood left the bench before concluding the proceedings.

The instances referenced above further demonstrate that Judge Blackwood's impartiality could be reasonably questioned. On more than one occasion, Judge Blackwood

---

[9] We note that the email referenced by Judge Blackwood stated the following: "I fear [Judge Blackwood] is playing fast and loose with off the record emails and other communication he states are to avoid the newspaper from knowing." While the email does reference "off the record emails," we do not equate such a statement to an accusation of unethical ex parte communications.

29

directed  hostility solely toward the State.  As required by article 6, section eleven of the Tennessee Constitution, every litigant is entitled to the "cold neutrality of an impartial court." *Leighton*, 414 S.W.2d at 421.  The Tennessee Supreme Court has observed that "[t]his provision is intended 'to guard against the prejudgment of the rights of litigants . . . .'" *Bean*, 280 S.W.3d at 803 (quoting *Austin*, 87 S.W.3d at 470).  Further, "'[i]n the trial of any lawsuit[,] the judge must be careful not to give an expression to any thought, or to infer what his opinion would be in favor or against either of the parties in the trial.'"  *Id.* (quoting *Leighton*, 414 S.W.2d at 420) (the Tennessee Supreme Court reversing and remanding for new trial because the trial court stated, among other things, "I don't care what proof is in the record, if the Governor doesn't pardon this man, I am going to grant the petition. . . . ")). Judge Blackwood made numerous statements on the record of his distaste for certain motions filed by the state and his plans to deny any such motions, ultimately concluding that "until the Supreme Court tells me otherwise, I am not leaving."  Moreover, Judge Blackwood made allegations of unethical conduct on the part of at least one attorney for the State based on a misinterpretation of an email sent by that attorney.  At the very least, the statements by Judge Blackwood support the conclusion that a person of ordinary prudence would find a reasonable basis for questioning the trial court's impartiality towards the State in these three cases.

### III. Conclusion

In summary, this Court acknowledges that Senior Judge Jon Kerry Blackwood undertook difficult tasks in presiding over the cases involved in this appeal and the State prosecution of former Judge Richard Baumgartner.  We have no doubt that Judge Blackwood subjectively has made every effort to approach these cases in an unbiased manner.  We, however, are required to review the record to determine if Judge Blackwood's impartiality could reasonably be questioned by an objective person.  As we have noted, "[t]he appearance of impropriety is conceptually distinct from the subjective approach of a judge facing a possible disqualification challenge and does not depend on the judge's belief that he or she is acting properly."  *See Liteky*, 510 U.S. at 533, n.2.

Based upon this objective standard, our careful review of the records in these cases compels us to conclude that the combination of actions and comments by Judge Blackwood, as detailed in this opinion, would lead an objective person to reasonably question the impartiality of Judge Blackwood in these three cases. Because of the "immense importance" that the public "have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice," we reverse the decision of the trial court and grant the State's motion for recusal of Judge Blackwood in these three cases. *See In re Cameron*, 151 S.W. at 76.

As a result, Judge Blackwood is recused in the three cases at issue in this appeal. The stay previously entered in these cases shall remain in effect until the Chief Justice of the Tennessee Supreme Court enters an order appointing a replacement judge or pending further orders of this Court or the Tennessee Supreme Court. Upon that appointment, the new trial judge shall review and rule upon the thirteenth juror issues in all three of these cases in accordance with the directives of the Tennessee Supreme Court, as stated in its order in the prior appeal of these cases, and shall proceed with all other proceedings necessary to bring these cases to conclusion.

_____
ROBERT W. WEDEMEYER, JUDGE